THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UMAR HASSAN BURLEY, et al.<br>    *Plaintiffs*,<br><br>v.<br><br>BALTIMORE POLICE DEPARTMENT,<br>et al.<br>    *Defendants*. | Civil Action No. ELH-18-1743 |

**MEMORANDUM OPINION**

This civil rights case is rooted in the disturbing events of April 28, 2010, and involves current and former members of the Baltimore Police Department ("BPD" or the "Department") and its now defunct Gun Trace Trask Force ("GTTF").

In a 59-page Second amended Complaint ("SAC," ECF 23), plaintiffs Umar Hassan Burley and Brent Andre Matthews filed suit against the BPD; former Deputy Commissioner Dean Palmere; and several former and current police officers: former Sergeant Wayne Earl Jenkins; former Sergeant Richard Willard; Sergeant William Knoerlein; Sergeant Ryan Guinn; Lieutenant Michael Fries; and former Officer Keith Gladstone.[1]

---

[1] Plaintiffs filed their initial Complaint on June 13, 2018, naming as defendants the BPD, the State of Maryland, Jenkins, Guinn, Gladstone and the Estate of Sean Suiter. ECF 1. They filed a First Amended Complaint on September 11, 2018 (ECF 3), adding Palmere as a defendant, and dismissing the suit as to the State of Maryland and the Estate of Sean Suiter. They also added a count of supervisory liability. On December 21, 2018, plaintiffs filed the SAC, adding Willard, Knoerlein, and Fries as defendants, as well as a claim of "Indemnification for Civil Judgment." ECF 23.

Suiter was a member of the GTTF. He died of a gunshot wound to the head on November 16, 2017, one day before he was scheduled to appear before a federal grand jury. The cause of his death – suicide or homicide – is the subject of continued investigation and debate.



### 4. Supervisory Liability (Count V)

Count V asserts a claim for supervisory liability against Willard, Knoerlein, Fries, and Palmere.

Defendants argue that plaintiffs "fail to state a claim because there is no allegation" that defendants were "personally involved in the deprivation of Plaintiffs' constitutional rights." ECF 29-2 at 15. They contend that under § 1983, "individuals are not vicariously liable and cannot be sued under a theory of *respondeat superior*." *Id*. (citing *Love-Lane*, 335 F.3d at 782). Therefore, defendants maintain that "there is no basis for direct liability" against them. ECF 29-2 at 15.

Plaintiffs counter that defendants "misunderstand" supervisory liability. ECF 35 at 25. They agree that "supervisors may not be held liable under a theory of *respondeat superior*." *Id*. at 26. But, they contend that Count V is asserted "under the distinct theory of supervisory liability as recognized by the Fourth Circuit." *Id*. (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("Liability in [the] context [of supervisory liability] is not premised on *respondeat superior*, . . . but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.")).

Indeed, a public official or agent "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676; *see Monell*, 436 U.S. at 691; *Love-Lane*, 355 F.3d at 782 (finding no respondeat superior liability under § 1983); *Trulock*, 275 F.3d at 402 (finding no respondeat superior liability in a *Bivens* suit). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

64

Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Fourth Circuit has stated: "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013). As indicated, to state a claim for supervisory liability under § 1983, plaintiffs must allege: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). In other words, the liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan*, 737 F.2d at 372).

With respect to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. As to the second element, "a plaintiff [o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no

basis upon which to anticipate the misconduct." *Randall,* 302 F.3d at 206 (alteration in *Randall* and internal quotations omitted). "Deliberate indifference, however, may be satisfied by showing [a] supervisor's continued inaction in the face of documented widespread abuses." *Id.* (alteration in *Randall* and internal quotations omitted); *see Wilkins*, 751 F.3d at 226-27.  As to the third element, "'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'"  *Wilkins*, 751 F.3d at 226-227 (quoting *Shaw*, 13 F.3d at 799).

The case of *Lee v. Queen Anne's County Office of Sheriff,* RDB–13–672, 2014 WL 476233, at *8 (D. Md. Feb.5, 2014), is informative. In *Lee,* the plaintiff had allegedly driven through a stop sign. *Id.* at *1.  He claimed that he was not driving the car nor did he drive through a stop sign. Nonetheless, a warrant was issued for his arrest. *Id.*  Upon learning about the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day." *Id.* He was convicted of fraud, failure to stop, and driving with a revoked license. *Id.*  But, an investigation of the events surrounding the stop revealed dashboard camera video evidence suggesting that the deputy had testified falsely.  Moreover, the prosecutor purportedly concluded that the camera footage revealed no probable cause for the traffic stop. *Id.* at *2. As a result, the "charges" were subsequently nol prossed. *Id.* at *2.

Lee subsequently filed suit against Queen Anne's County Office of the Sheriff.  He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result." *Id.* at *2. Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family

during a two-month period...." *Id.* at *17 (quoting the amended complaint). And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the sheriff of Queen Anne's County liable for the deputy's conduct. *Id.* at *8.

In Lee's amended complaint, he alleged that the sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct, *id.* at *9 (quoting the amended complaint):

> a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]
>
> b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.
>
> c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

The plaintiff insisted "that these allegations are sufficient to support his claim that [the sheriff] had constructive knowledge of his deputies' unconstitutional conduct" and acted with deliberate indifference. *Id.* Urging dismissal, the sheriff argued that plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

In effect, the question before the court was whether the "Amended Complaint contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early stage

67

of the litigation." *Id.* at *9. The *Lee* Court found that the allegations "present[ed] a close case," but it ruled that plaintiff adequately pleaded a claim for § 1983 supervisory liability. *Id.*

The court noted that "the specific instances of misconduct adequately supplement that claim and demonstrate the requisite constructive knowledge and deliberate indifference." *Id.* In particular, it said that "[t]he 2007 event pertaining to the traffic stop clearly raises potential Fourth Amendment issues" similar to the case at bar. *Id.* The court also noted that "[t]he 2009 and 2007 incidents, as alleged, also suggest that the Sheriff's Office-and Sheriff Hofmann in particular-have failed to properly supervise and discipline the deputies because the deputies allegedly remained a part of the Sheriff's Office despite their misconduct." *Id.* The court observed: "Above and beyond these incidents, [plaintiff's] claims involve repeated instances of harassment spanning a two month period." *Id.*

Here, the SAC sets out in abundant detail a protracted history of misconduct by members of the BPD who were under the supervision of these defendants.

For example, and as already recounted, plaintiffs allege that Fries was Officer Jenkins's supervisor in 2005, when "Jenkins struck Timothy O'Conner in the face," resulting in a settlement paid by Baltimore City. *Id*. ¶ 107. Jenkins and another officer claimed that "they had not seen who had harmed Mr. O'Conner as they were purportedly distracted by another altercation." *Id*. ¶ 85. However, "two witnesses testified that they saw an officer throw Mr. O'Conner to the ground and hold him down with a nightstick." *Id*. ¶ 85. According to the SAC, "Fries had actual or constructive knowledge of Officer Jenkins' use of excessive force against Timothy O'Conner," but "took no remedial or disciplinary action against Officer Jenkins." *Id*. ¶ 108.

The SAC also states that Fries supervised Jenkins "when IAD sustained a finding against Officer Jenkins for a vehicular accident it deemed 'preventable.'" *Id*. ¶ 106. In addition, Fries and

68

Knoerlein directly supervised Officer Gladstone in VCID when Gladstone and Jenkins arrested Mickey Oakley in 2008 and Jamal Walker in 2010. *Id*. ¶¶ 111, 116.

Further, plaintiffs allege that Jenkins and other officers entered Oakley's apartment without a search warrant, a practice known as a "sneak and peak." *Id*. ¶ 88. That same day, Jenkins and another GTTF officer "stopped and apprehended" Oakley. *Id*. ¶ 89. Plaintiffs claim that at a hearing in 2009, "Officer Jenkins took the stand and lied when he stated a fellow officer . . . had told him that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV." *Id*. ¶ 90. Due to Jenkins's misconduct, prosecutors later agreed to release Oakley from prison. *Id*. ¶ 91.

The SAC also alleges that in November 2010, Jenkins and Gladstone "arrested Jamal Walker during a car stop and then went to Mr. Walker's home, where they tried to break in." *Id*. ¶ 92. During the attempted break-in, a silent alarm was set off, which brought additional officers to the home. *Id*. But, Jenkins and Gladstone "sent the police away so that they could conduct a search of the home themselves." *Id*. According to the SAC, "[p]rosecutors later dropped the case against Mr. Walker once the inconsistencies in Jenkins' account came to light." *Id*.

In addition, plaintiffs allege that Willard supervised Jenkins, both prior to and during the arrest of Burley and Matthews on April 28, 2010. *Id*. ¶ 117. According to plaintiffs, "Willard had actual or constructive knowledge of Officer Jenkins' history of misconduct prior to joining VCID," including "the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Conner." *Id*. ¶ 118. Also, "Willard was present at the scene when drugs were planted in Mr. Burley's car[.]" *Id*. ¶ 119.

Willard, Knoerlein, and Fries also held "supervisory roles in VCID . . . when that unit's officers were committing widespread abuses, including the repeated illegal conduct of Jemell.

69

Rayam." *Id*. ¶ 123. In March 2009, Rayam "fatally shot Shawn Cannady while working as part of VCIS." *Id*. ¶ 60. It was Rayam's "third shooting in a span of 20 months." *Id*. And, the City "later settled a lawsuit brought by Mr. Cannady's family for $100,000." *Id*.

With respect to Palmere, the SAC alleges that he "had actual or constructive knowledge of the misconduct by officers in the plainclothes units" based on several incidents of misconduct. *Id*. at 24. Plaintiffs assert that Palmere "supervised the VCIS officer who assaulted Jerriel Lyles, resulting in a $200,000 payout to Mr. Lyles." *Id*. ¶ 139. Also, Palmere "had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving on in Howard County in 2010[.]" *Id*. At the GTTF trial, former GTTF member Momodu Gondo testified that "Palmere assisted and coached" Rayam "in the cover-up of the fatal shooting of Mr. Cannady." *Id*. Further, plaintiffs allege that Palmere "did not take any steps to report or remedy illegal conduct of the Officer Defendants or other plainclothes officers that he knew of or should have known of." *Id*. ¶ 145.

Taking the foregoing allegations as true, and drawing all inferences in plaintiffs' favor, as I must, the SAC amply states a claim of supervisory liability as to Willard, Knoerlein, Fries, and Palmere.

### 5.    Malicious Prosecution (Count VII)

In Count VII, plaintiffs lodge a malicious prosecution claim under State law against Jenkins, Guinn, Gladstone, and Willard. The SAC alleges that the officers accused Burley and Matthews "of criminal activity knowing those accusations were without probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue judicial proceedings." ECF 23, ¶ 306. Plaintiffs further aver that defendants "fabricated evidence and withheld exculpatory evidence that would have proven Plaintiffs' innocence." *Id*. ¶ 309.

the BPD Motion.  I shall also DENY both the Officer Motion (ECF 33) and the Jenkins Motion (ECF 41).

An Order follows, consistent with this Memorandum Opinion.


Date: September 12, 2019                              /s/
                                                     Ellen L. Hollander
                                                     United States District Judge